Good morning, everyone. Let me say at the outset that we appreciate very much that Council has been able to come. We know that travel has not been easy, and we're glad that we're able to proceed with the schedule. So, our thanks to you. The first argued case this morning is number 13-1473, N. Ray Berger. Mr. — tell me how to pronounce your name, Your Honor. Yes, Your Honor. Good morning, Your Honors. Jesus Sanchelema. Sanchelema, thank you. On behalf of Mr. Berger, may please report. Our presentation here will be directed to salient aspects of the erroneous rejections of the board of our Jepson-type claim, which I filed 10 years ago. I never imagined that I would be taken through this rather convoluted procedures. The system involves overhead garage doors, garage door panels, and in particular, joints in these contiguous panels are being protected with the system. The rejections fall in two groups, 102 and 103. Within the 102 rejection, the references are mainly Liest and Berger, and these same rejections on the 103 are combined to purportedly show obviousness of the claimed invention. This Jepson-type claim is very similar to the reference, the Berger reference cited by the same applicant appellant, whereas the same preamble, or substantially the same preamble, was used. However, when the improvement was, the claim for improvement was prepared, we tried to track that same language that didn't have any problems with the patent office, and we, our intention was to just claim the salient feature of the improvement, namely the enhancement of the enforcement of the joints that, of the contiguous panels that make up the system for the doors. And it is, that's what I'm trying to completely understand is what exactly, what enhancement factor is it that you think you're claiming? Because part of my problem is, is that your brief seems to argue a lot of things about a lot of limitations, but I just don't read them into the claim. Well, the insertable reinforcement there is placed right underneath the joints. There are two panels here, exactly the same, a reverse J here, and a regular J on the top. And it is the reinforcement that is inserted inside. That occurs in the earlier Berger reference. In the earlier Berger. And the improvement... What's the difference? I'm sorry. What's the difference? And the improvement being the conforming of this reinforcement to the joints. Okay, and so where in the claim does it say conforming of the reinforcements to the joints? Right after the transitional phrase you are towards... Insertable horizontally and interiorly within said top and bottom ends from one lateral end to the other lateral end, uninterrupted, and having conforming longitudinal portions. So I guess, and coming in abutting longitudinal contact, I don't see what, why that doesn't read on the first Berger reference as well. Because the first Berger reference, if Your Honor directs her attention to Figure 4, it follows the contour of the reversely folded portion. And that includes the first fold, the first fold of that reversely folded section are the joints. And it is by following this joints what makes this improvement past all this wind test and so forth. I don't disagree that the figures look different between the two Berger references. The problem that I have is that the claims don't describe the exact thing that Why didn't you amend the claim? If that's really the improvement, why didn't you amend the claims after the first rejection to make it clear that you were talking about the continual as opposed to just abutting, that you were talking about a continual abutting or an abutting that follows the exact joint? That wasn't our understanding throughout, Your Honor. We went to the Board of Appeals and the examiner was rejected under a new ground, Session 112, and we went through numerous discussions about this same issue as to what open ends are, how this insertable reinforcement conforms, and so forth. It was our understanding that this was very well laid out and very well understood after that first trip to the Board of Appeals, the path of the Board of Appeals. But are brought up that have nothing to do with what was originally claimed. Again, it's not a question of whether the Board understood what you think your improvement was or I understand what you think your improvement was. The question is, what have you claimed so that the public can understand? The word conforming, Your Honor. The word conforming was not used in the Berger 293 Act. And that is the key word that we have maintained throughout for the past 10 years trying to accentuate the fact that this inventor was the first one to realize that the joints were the most vulnerable parts of the overhead door panels. All right. Well, you understand that at the application stage, the construction of the terms. I understand. When you understood from the examiner that the examiner didn't think conforming got you as far as you wanted, why didn't you consider amending your claims to be more precise? We did, Your Honor. We amended the claim. And in fact, contrary to what the Board states now that we took out the conforming with the complementing joints as it was originally stated, the reason why we did that was because we wanted to narrow the claim to encompass not only the joint, the top portion, and 24 and 26 in Figure 4, but also the rest of the reversely folded portion. And that's the reason why it was taken out from the body of the claim after the transitional phrase to the preamble. But still there, and the conforming word still there, you won't find it in the 293 patent. You won't find it anywhere, especially in 2004 when this particular invention came about. But are you telling us that there were subordinate claims in which you elaborated on what was meant or intended by the word conforming? This is a difficulty with a word that on its face can have almost any meaning, and to say this is my invention. Yes, Your Honor. And what the intent was with Claim 2, I believe Your Honor is referring to, were the conforming of the fourth wall and the fifth wall to the contour of the joint. What we're trying to do there was comply with the best mode requirement, which was more strange than before the new law, and provide for an embodiment, claiming an embodiment that would rely on the roll-forming technique that is less expensive, but it would not allow us to really have a continuous joint at the top for the reinforcement. And that's the reason why that Claim 2 came about as a claim, as a picture claim for the best mode that we consider to be the roll forming, the least expensive technology that we had available to build this reinforcement members. Now the Office and its rejections grouped all of the subordinate claims with the broadest of the claims. Had you explored as deeply as one can the possibility of restricting yourself, as Judge O'Malley has raised, to that which was explicitly the difference, the improvement? Yes, Your Honor. We have, to the best of my ability, attempted to bring that up all along. We are interested in protecting the joints, and our reinforcement follows the contour of the joints. Nobody has done that before, nobody had done that before 2004, when we had our own client with his 1999 patent. Tell me why LIST isn't anticipatory, and particularly why if you join those pieces in LIST, it isn't unitary once it's joined. Yes, LIST has several problems, that's one of them. It's not unitary, isn't it, once it's joined? Well, one of the reasons being that for to have that unitary contact along the entire length of the panel, not the sub-panel, because LIST talks about four different sub-panels that make up a panel. There is member 68 that goes across and divides, it's sandwiched between sub-panels, and LIST will not allow that contact to go uninterrupted from one end to the other end of the four sub-panels that compose the panel. That's one of the answers. There are other deficiencies with LIST, and LIST was brought up by the examiner because of that friction fit with this unmarked ribs that they located remote from the ends, and the reason why they rely on that is because nobody else had that fit. In this case, they used the lower walls of the reinforcement to come in contact in the abutment and it's fitted there. So they're trying to use that to say, okay, this is the same thing because the end can go, the reversely folded portions can go through an unlimited distance anywhere, but that's not the case. If your Honor's attention is directed to A51, which is the application where we state that we have the panels, 20 is composed of wall 22, and the reversely folded portion, that starts here with 24, and the other way would be 26. So we do define the reversely folded. It's been defined all along. It surprises me that suddenly this is a new thing or that we are advocating for an invention that claims the protection of the joints. When this has been in the application, we mentioned that it was the most vulnerable part of the invention. That's why we had all those failures, wind test failures, and so forth. Then we submitted evidence of secondary considerations that were basically ignored by the board. We have also an amicus brief that supports our position that the etc. abbreviation used in Graham v. Deere should be construed in such a way that we would not be restricted, and this Court should not be restricted to a narrow understanding of what commercial success is. It should also include or have a different factor for profitability because it's more meaningful in showing as a non-technical factor that there is an invention that is not obvious. I don't know if I... I'm sorry I went straight from the question on the list that maybe I shouldn't have. As I understand your appeal, you're only asking us to reverse with respect to Claim 1, right? You don't mention Claim 2 through 4 at all. Claim 1 is the most important. Independent Claim 1 is the important claim. Claim 2 relates to a specific way of creating this reinforcement using the roll forming technique versus extrusions and other techniques, but Claim 1 encompasses the junction and also requires the inventor to have this abiding contact with the rest of the panel. So we would be satisfied with Claim 1, of course, and we believe that the rest of the claims will may fall or stand with Claim 1. Let's hear from the office, and we'll save the time you have left. Yes, I reserved half the time because I would expect... I'm afraid most of it was exhausted, but you have a lot of time. Thank you, Your Honor. Your Honor, may it please the Court. Appellant Berger originally presented four claims to the examiner, and one of those claims, Dependent Claim 2, expressly required conformance to the joints. However, that claim and the other dependent claims are not before this Court. The only claim that's been raised on this appeal, and the parties do not dispute this, is Claim 1, and the only thing Claim 1 requires is a budding longitudinal contact with the reversely folded edge portion. You mentioned the other claims in your reply, but is the position of the office that there was no patentable invention here, no matter how it was claimed, or just now, as you tell us, that Claim 1 may be perhaps written too broadly? The examiner found, and I believe the Board affirmed, that Claim 2, which does require conformance to the joints, is anticipated by Berger 293, by the Berger prior art patent, and that patent reveals an alternative embodiment. It's Figure 8-0, which is at A179 of the record, which... I was trying to take us away from whether the claims are written so broadly that they might be deemed anticipated, at least could be construed to be anticipated, or whether there was nothing here in the preferred embodiment or whatever, that is a patentable advance. Again, the examiner and Board found that everything was anticipated. The claim, though, on this appeal... Well, we know that there are differences. Yes, yes, and with regard to the issue that came up earlier about whether the claims were grouped, the Board and examiner did rely on a different analysis for the dependent claims. There, they conceded that conformance to the joints is required, but found it was anticipated. But again, that claim simply hasn't been appealed. The only claim before this Court is the one that requires a budding longitudinal contact with the reversely folded-edge portions. Moreover, the parties don't... You keep saying a budding longitudinal contact, but your friend on the other side emphasizes the use of the word conformity, and he says that implies that the budding longitudinal contact has to be continuous and conforming to the shape. How do you respond to that? The claim does use the word conforming, but conforming doesn't tell you to what... It doesn't answer the question conforming to what. The part of the claim that answers that is the phrase that follows it, a budding longitudinal contact, and that suggests lengthwise contact. And again, the claim requires a budding longitudinal contact with the reversely folded-edge portion, not with the complementing joints. Claim 2 did require that. It required conformance to the joints. Moreover, Claim 1, as originally submitted to the office, did require a budding longitudinal contact with the complementary joints. But on August 23rd of 2011, Appellant amended his claims to strike that requirement and replace it with the requirement of a budding longitudinal contact with the reversely folded-edge portion. Particularly in light of that prosecution history, it was entirely reasonable for the Board to conclude that if the claim originally did require a budding longitudinal contact with the complementing joint, and that was stricken in favor of a budding longitudinal contact with the reversely folded-edge portion, the claim as before this Court does not require that the budding contact be with the complementing joint. Moreover, I'd add that, again, the principal issue on this appeal is, did the Board reasonably conclude that the reversely folded-edge portion includes more than the extreme ends and the joints, and does that term also include the walls that extend perpendicularly to and away from the ends of the door panels? And in this particular case, Appellant's own specification provides us a definition of reversely folded-edge portion. This appears in the joint appendix at page 851, about lines 12 through 23 for those who want to trust but verify, and that definition makes clear the reversely folded-edge portion is formed from upper and lower longitudinal ends 24 and 26. The same specification goes on to note that these upper and lower longitudinal extending interwalls 28 and 29. These longitudinally extending interwalls that are defined by the specifications, part of the reversely folded-edge portion, are pictured in figure four of the application at page 859. The numbers 28 and 29 are a little difficult to spot in this drawing. The number 28 appears in the upper left corner, the number 29 appears in kind of in the center of the bottom, about three figures in from the two machine screws depicted in the drawing. And as that drawing makes clear, these longitudinally extending interwalls are in fact perpendicular to and extend away from the ends of the door panels. Given that the Appellant's own specification defines these walls as part of the reversely folded-edge portion, it was entirely appropriate for the board to construe that term as including these walls, and therefore to find that the Leist and Berger 293 references, which both clearly show contact with walls extending perpendicularly to and away from the ends of the door panels, do in fact anticipate that claim term. Let me turn you to the, I understand you don't think we ever get to the 103 rejection, but assuming that we were to disagree with you on anticipation and think that 103 is the only way we could resolve this question, I am interested or intrigued about the argument as it relates to what you can consider as it relates to commercial success. And you seem to concede in your brief that our law does not exclude consideration of cost-saving or profitability. And yet it does seem that the board excluded that consideration. What the board said was, well we're not going to rely on a law review article, which is entirely appropriate. We expect the board to rely on the manual patent examination procedure. But on the last page of the decision on rehearing, the board did go on to say, and furthermore, the evidence of commercial success doesn't show the type of specificity that we would want. There is, you know, significant evidence of reduced costs in this case, but we would need to know what is the context, what are the total costs, what is the total profitability, to simply cite a figure by which the cost of producing the doors is reduced doesn't tell you the strength of that evidence. To know that, you need to know the complete picture of, you know, how much does it cost to make these doors and what were the total profits. So the government's saying perhaps someday we'll go there. Yes, Your Honor. Yeah, maybe it's the econ background in me, but it seems that reduced costs would seem to go directly to the concept of commercial success. And there are precedents of this court that, at least in passing, suggest that reduced costs or increased profits might be part of that analysis, but the director hopes that it's not necessary to reach that issue in this particular case, where two other references are each independently found by the board to anticipate the claim that's before the court. Let me ask you a question about the board's procedure. I noticed, for instance, that in discussing lice, the board complains that claim one doesn't state that the reinforcement member has a particular rigidity. Planting the seed, certainly a forum seed, that if it had made that statement, perhaps the board would have viewed it differently or at least not found that it was anticipated by lice. There's some sort of obligation to permit or authorize further examination or by which the patentability could indeed be sustained, but which is not reflected in the claims. Rather than going through all of this and presenting it to us to decide whether perhaps it should go back. Well, the board is forced to address the claim terms that were presented to them, and the only claim term that was used was unitary. And unitary, as the board found, does not exclude an item that's composed of different pieces, but then it's formed together into one. That wasn't my question. I hear the board made a firm statement as if it says that we're not persuaded by appellant's argument because it's not commensurate with the scope of the claim and that claim one does not recite that the reinforcement member must pass the high wind test, nor have a particular rigidity. Doesn't that say that if claim one had these recitations, the board would at least not have found it speculation? But yes, that does seem likely. Perhaps. And so what is the obligation when such a speculation is actually raised itself by the board? Is it an obligation for further examination? Frankly, the argument should have been presented in the first instance to the examiner, and then the claim should have been amended if, you know, if appellant means to claim a reinforcement bar that's composed of only one piece, that's not assembled from different pieces, that simply should have been made clear in the claims themselves. But the only term that we have here is unitary, and unitary does not exclude the possibility of the leist piece, which forms one single piece once it's assembled from different pieces. Moreover, the leist patent itself makes clear that its reinforcement member that's composed of different pieces is actually an unitary piece, and the prior art includes one single continuous piece. Leist's particular purpose is to have a reinforcement member that's easier to stock and for consumers to transport, and a single continuous piece wouldn't have been suitable for leist's purposes, but it is nevertheless part of the prior art that leist itself cites. But again, fundamentally, there's simply been no argument presented as to why the leist piece, once it's connected into one single continuous piece, and not a single continuous piece. And in fact, since the issue has become more prominent in this appeal, the director would like to cite to the court a case of this court that gives some meaning to the term unitary. This is Pass and Seymour, a decision of this court from 2010, 617 F.13.19, and this, in this particular case, this court said that the plain meaning of unitary is a single continuous structure. The court went on to note that unitary does not require a member cast from a single die or molded from a single piece of metal. A unitary structure may contain layers or be formed by an additive process. And the office would submit that that perfectly describes the leist reinforcement member, which forms one single piece, but is formed from an additive process from different pieces. When I asked your opposing counsel about that, it seemed to argue that, in fact, leist was in four pieces, no matter what. Comment on that, because I don't take it from what I'm seeing, but. I suppose it could depend on the leist references on whether you're looking at the reinforcement member within just one panel or across the whole door. The leist reinforcement number is, I believe it's composed of what he calls reduced portion 38 and larger tubular portion 40. I apologize for the terminology, which forms then piece 32, which is the connecting bar. And it does appear there may be more than one connecting bar that connects, so it could add up to four. But within one panel, it just seems to be those two pieces that, at least within one panel, it's just those two pieces that connect together to form item 32. Any more questions? Okay, thank you, Mr. Vitale. Mr. Sancho-Lemus. Your Honor, I'm going to try to be as brief as possible, but I believe that our case was made with a statement by counsel that basically they don't give any weight to their word conformance. As far as the amendment that he refers to, the 2011 amendment, we narrow the scope of the claim by introducing the entire reversely folded that includes the folded member. But his emphasis was that you changed it, you changed what it had to conform to. Right. And that was the critical piece. He says now it's conforming with said reversely folded edge portions, which is what they believe occurred in the first Berger reference. Exactly, and that includes the longitudinal N-24 and lower longitudinal N-26 extending their form, because we state second paragraph in the detailed description of the preferred embodiment. Each panel section includes wall 22, let me see where my example is, wall 22, which would be this portion here, with reversely folded edge portions. Forming upper longitudinal N-24 and lower longitudinal N-26 extending their front. So by applicant replacing the joints with the reversely folded portion, it is including still the joints. It's making it narrow because now we're constrained and we have to have also conforming to the entire reversely folded portion. I have three minutes left. With respect to the profitability analysis, in Ref. 1, cited by counsel where they require us to come up with hard evidence of profitability, that case, in that case the board held that there was, that profitability was a factor that they could consider. Yet, I would like to just read very quickly what it says at page 137. This is 100 Federal Third 135. The board was not persuaded by the assertions because they were neither supported by an evidentiary showing nor placed in a meaningful context, e.g. market share or profitability. That's at page 137. That's what this court summarized of what the board had said, at least what the reporter picked up. Now, this court accepted the board's pronouncement by saying, we agree with the board that Juan has not provided sufficient proof to establish that his grips were commercially successful. At page 139, same authority that they're citing. In the case that they're citing, which I believe is Bio-Rad, there was a purchase of an equipment that cost about $65,000, and one witness testified... I think you're misunderstanding, at least for here. The government's not defending the fact that the board said it needed sales data. I mean, they're essentially conceding that that was probably a misstatement or at least a too narrow a view of commercial success. Their point is, even if profitability is a factor, that you didn't give them the hard numbers that they needed to show that. Exactly, and what I'm trying to do, Your Honor, is compare what happened in the Bio-Rad labs, where one piece of equipment, there was one witness testifying, and one piece of equipment was paid back in two weeks $65,000. Well, the evidence that we have is that we saved $50 from $50 to $75 for each door that we manufactured. We manufactured thousands of doors. All that is in the declarations that we have submitted that were not given due weight. That's the position that we've taken with respect to commercial success. And the board appears to have been harnessed or restrained from using the profitability test or factor at this point because of the reviewing courts not allowing this flexibility. And I believe that some sort of clarification on this point is in order, especially because Gramby Deer uses the word et cetera when talking about these factors. And KSR also invites the inventors to be as creative as they can be in terms of developing new inventions to increase our standard of living. Any more questions?  Thank you, Bill. Thank you, Mr. President.